No. 21-56039

# In the United States Court of Appeals
## for the Ninth Circuit

RUSSELL FOUTS AND TAN MIGUEL TOLENTINO

*Plaintiffs-Appellants*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE
STATE OF CALIFORNIA,

*Defendant-Appellee*.

**Appeal from a Judgment of United States District Court
For the Southern District of California
Civ. No. 3:19-cv-01662-BEN-JLB
United States District Court Judge Roger T. Benitez**

### Appellants' Opening Brief

ALAN ALEXANDER BECK
2692 Harcourt Drive
San Diego, California 92123
Telephone: (619) 905-9105
alan.alexander.beck@gmail.com

STEPHEN D. STAMBOULIEH
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
stephen@sdslaw.us

*Attorneys for Appellants Russell Fouts and Tan Miguel Tolentino*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ......................................................... 4

STATEMENT OF THE ISSUE FOR REVIEW ........................................ 4

STATEMENT OF THE CASE ................................................................ 5

I.   California Law Bans the Ownership and Possession of Batons in the Home ........................................................................................... 5

II.  Procedural History ........................................................................ 5

    A.   Plaintiffs' Constitutional Challenge to California's Baton Ban .......... 5

    B.   The District Court's Grant of Defendant's Motion for Summary Judgment and Entry of Judgment ........................................ 6

        1.   Summary of the District Court's Order ...................................... 6

        2.   The District Court's Judgment.................................................. 6

SUMMARY OF THE ARGUMENT ....................................................... 7

ARGUMENT ...................................................................................... 10

I.   Legal Standard ............................................................................. 10

II.  California's Ban on Batons Violates the Second Amendment .................... 10

    A.   California's Ban on Batons is Not Longstanding ............................... 10

    B.   Batons Are Not Dangerous and Unusual ........................................ 21

    C.   The Prohibition on Carrying Dangerous and Unusual Weapons Refers to Types of Conduct ................................................................ 27

III.   Applying the Appropriate Level of Scrutiny ................................................ 43

    A.   California's Ban Is Categorically Invalid ........................................... 43

    B.   Strict Scrutiny Should Apply .............................................................. 44

    C.   Even if Intermediate Scrutiny Applies, California's Ban is
        Unconstitutional .................................................................................. 46

    D.   There is not a Reasonable Fit Between the Ban and Public Safety .... 51

CONCLUSION ........................................................................................................ 53

STATEMENT OF RELATED CASES .................................................................... 54

CERTIFICATE OF COMPLIANCE ....................................................................... 55

CERTIFICATE OF SERVICE ................................................................................ 56

# TABLE OF AUTHORITIES

## CASES

*Albino v. Baca*,
747 F.3d 1162 (9th Cir. 2014) ...........................................................................10

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011)............................................................................................50

*Avitabile v. Beach*,
368 F. Supp. 3d (N.D.N.Y. 2019)................................................................26, 27

*Bannon v. U.S.*,
156 U.S. 464 (1895)............................................................................................11

*Baron Snigge v. Shirton*,
79 E.R. 173 (1607)..............................................................................................31

*Binderup v. AG of United States*,
836 F.3d 336 (3d Cir. 2016) ........................................................................18, 19

*Broussard v. Univ. of Cal. at Berkeley*,
192 F.3d 1252 (9th Cir. 1999) ...........................................................................10

*Caetano v. Massachusetts*,
577 U.S. 411 (2016)........................................................................................8, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................10

*City of Akron v. Rasdan*,
663 NE2d 947 (Ohio Ct. App., 1995).................................................................27

*City of Los Angeles v. Alameda Books, Inc.*,
535 U.S. 425 (2002)................................................................................48, 49, 50

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986)..............................................................................................49

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .................................................................................. *passim*
*Duncan v. Becerra*,
  265 F. Supp. 3d (S.D. Cal. 2017) ........................................................20

*English v. State*,
  35 Tex. 473 (1871) .............................................................................41

*Fasset v. Smith*,
  23 N.Y. 257 (1891) ............................................................................11

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) .............................................................15

*Fyock v. City of Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015) .............................................................13

*Grace v. District of Columbia*,
  187 F. Supp. 3d (D.D.C. 2016) ....................................................49, 50

*Griffin v. State*,
  47 A.3d 487, 2012 Del. LEXIS 319 (Del., June 18, 2012) ................27

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) ....................................................14, 49

*Heller v. District of Columbia*,
  801 F.3d 264 (D.C. Cir. 2015) ...........................................................50

*Jackson v. City & Cty. of S.F.*,
  746 F.3d 953 (9th Cir. 2014) ................................................... *passim*

*Kachalsky v. Cty. of Westchester*,
  701 F.3d 81 (2d Cir. 2012) ................................................................45

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) ...........................................................................48

*Maloney v. Singas*,
   351 F. Supp. 3d (S.D.N.Y. 2018) .......................................................26

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
   138 S. Ct. 1719 (2018) ........................................................................50

*McDonald v. City of Chi.*,
   561 U.S. 742 (2010)......................................................................15, 48

*Miller v. Bonta*,
   No. 19-cv-1537-BEN (JLB), 2021 U.S. Dist. LEXIS 105640
   (S.D. Cal. June 4, 2021).....................................................................30

*Miller v. Johnson*,
   515 U.S. 900 (1995).............................................................................53

*Minority TV Project, Inc. v. FCC*,
   736 F.3d 1192 (9th Cir. 2013) ............................................................53

*N.Y. State Rifle & Pistol Ass'n v. Corlett*,
   209 L.Ed.2d 590 (U.S. 2021)..............................................................10

*NRA v. BATF*,
   700 F.3d 185 (5th Cir. 2012) .................................................12, 14, 18

*Neilson & Sarrazin v. Dickenson*,
   1 Des. 133 (1785).................................................................................35

*New York State Rifle & Pistol Ass'n v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) ...............................................................23

*O'Neill v. State*,
   16 Ala. 65 (1849).................................................................................40

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017).........................................................................48

*People v. Mercer*,
   42 Cal. App. 4th Supp. 1 (1995).........................................................44

*People v. Webb*,
  2019 IL 122951 ............................................................................. 27, 44

*People v. Yanna*,
  824 N.W.2d 241 (Mich. Ct. App. 2012) ............................................ 44

*Powell v. McCormack*,
  395 U.S. 486 (1969) ......................................................................... 15

*Ramirez v. Commonwealth*,
  479 Mass. 331, 94 N.E.3d 809 (2018) .............................................. 44

*Rex v. Dewhurst*,
  1 State Trials, New Series 529 (1820) ............................................... 36

*Rex v. Knight*,
  90 Eng. Rep. 330 (K.B. 1686) .......................................................... 37

*Rex v. Rowland Phillips*,
  98 E.R. (1385) ................................................................................. 31

*Seminole Tribe v. Fla.*,
  517 U.S. 44 (1996) ........................................................................... 13

*Silvester v. Harris*,
  843 F.3d 816 (9th Cir. 2016) ............................................................ 46

*Simpson v. State*,
  13 Tenn. Reports (5 Yerg.) 356 (1833) ........................................ 41, 42

*State v. Blocker*,
  291 Ore. 255 (1981) ......................................................................... 26

*State v. Dawson*,
  272 N.C. 535 (1968) ........................................................................ 29

*State v. Deciccio*,
  315 Conn. 79 (2014) ............................................... 20, 24, 25, 27

*State v. Delgado*,
  692 P.2d 610 (1984)...........................................................................27

*State v. Griffin*,
  2011 Del Super LEXIS 193 (Del Super Ct, May 16, 2011)...............................27

*State v. Herrmann*,
  873 N.W.2d 257 (Wis. Ct. App. 2015).................................................27

*State v. Kessler*,
  289 Or. 359 (1980)...............................................................17, 25, 26

*State v. Langford*,
  10 N.C. (3 Hawks) 381 (1824) ..........................................................41

*State v. Lanier*,
  71 N.C. 288 (1874) ........................................................................41

*State v. Montalvo*,
  162 A.3d 270 (2017)......................................................................22, 27

*State v. Norris*,
  2 N.C. 429 (1796) ..........................................................................35

*The King v. Oneby* 92 E.R. 465 (Court of the King's Bench 1727) ........................30

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*,
  450 U.S. 707 (1981).......................................................................45

*Turner Broad. Sys., Inc. v. FCC*,
  520 U.S. 180 (1997)....................................................................47, 52

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
  837 F.3d 678 (6th Cir.) ...................................................................19

*United States v. Chovan*,
  735 F.3d 1127 (9th Cir. 2013) ........................................................46, 47

*United States v. Hare*,
  26 F. Cas. 148 (C.C.D. Md.1818).......................................................30

*United States v. Henry*,
   688 F.3d 637 (9th Cir. 2012) ...................................................8, 21, 25

*United States v. Miller*,
   307 U.S. 174 (1939).........................................................................20, 24

*U.S. v. Mitchel*,
   2 U.S. 348 (Pennsylvania circuit court 1795).....................................35

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ..............................................................19

*U.S. v. Vigol*,
   2 U.S. 346 (1795)................................................................................35

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013) ..............................................................47

*Warder v. Arell*,
   2 Va. 282 (1796) .................................................................................35

*Wrenn v. District of Columbia*,
   864 F.3d 650 (DC Cir. 2017)........................................................11, 49

*Young v. Hawaii*,
   992 F.3d 765 (9th Cir. 2021) ................................................... *passim*

*Yukutake v. Conners*,
   No. 19-00578 JMS-RT, 2021 U.S. Dist. LEXIS 153586,
   __ F.Supp.3d __, 2021 WL 3625307 (D. Haw. Aug. 16, 2021) ...........13, 17, 43

## STATUTES

18 U.S.C. § 922(g)(4)..............................................................................4

28 U.S.C. § 1291 .....................................................................................4

28 U.S.C. § 1331 ....................................................................................4

28 U.S.C. § 1343 ....................................................................................4

28 U.S.C. § 2201 ....................................................................................4

28 U.S.C. § 2202 ....................................................................................4

42 U.S.C. § 1983 ....................................................................................4

42 U.S.C. § 1988 ....................................................................................4

Cal. Penal Code § 16590(m) ...........................................................2, 4, 5

Cal. Penal Code § 18010(b) .................................................................2, 5

Cal. Penal Code § 22210 ...........................................................1, 2, 4, 5

Cal. Penal Code § 22290 ....................................................................2, 4, 5

D.C. Code § 22-4514 ...........................................................................22

R.I. Gen. Laws § 11-47-2(a)(1) ..........................................................22

## RULES

Fed. R. App. P. 4(a)(1)(A) ......................................................................4

Fed. R. Civ. P. 25(d) ...............................................................................5

Fed. R. Civ. P. 56(a) .............................................................................10

## OTHER AUTHORITIES

The Writings of Samuel Adams (1904) ................................................17

4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND
(1769) .............................................................................................36

St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and the Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia 1803 ........................................... 30, 32, 33, 40

An Universal Etymological Dictionary (R. Ware, W. Innys and J. Richardson, J. Knapton (and twelve others)) (1675).................................................33

David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, DET. L. C. REV. 789 (1982) ............................................................36, 37

William Lawrence Clark, William Lawrence Marshal New York, Fred B Rothman & Co., A Treatise on the Law of Crime (1905) ...................................12

COMMENT: SECOND AMENDMENT DECISION RULES, NON-LETHAL WEAPONS, AND SELF-DEFENSE, 97 Marq. L. Rev. 853 (Spring 2014)......22

Timothy Cunningham, A new and complete law-dictionary 1789 .............28, 29, 30

John A. Dunlap, THE NEW-YORK JUSTICE (1815) ...........................................37

Hawkins, Pleas of the Crown, book 1, ch. 28, sec. 4. 40.........................................42

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY (1822)........................................................................................38

D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. Rev. 1359 ......................................................................................................20, 24

Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of Judges Reign? 36 OKLA. L.REV. 65 (1983)......................................................12

Stephen P. Halbrook, The Founders' Second Amendment (2008) .........................17

O. Hogg, Clubs to Cannon 19 (1968) ....................................................................17

Giles Jacob, The law-dictionary 149 (P. Bryne 1811 first American from the second London edition) (1811).............................................................................35

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994)................................................................37

National Shooting Sports Foundation, https://www.nssf.org/nssf-releases-firearms-production-figures/ ...............................................................................22

William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS (1826) ..................................................................................38

Statute of Northampton 2 Edw. 3, c. 3 (1328) .................................................27, 36

Symposium: The Second Amendment and the Right to Bear Arms After *D.C. v. Heller*: Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443 (2009) ..................................................................................................................23

The Collegiate Law Dictionary (James John Lewis ed., The American Law Book Company 1925) ................................................................................................34

The Cyclopedia Law Dictionary (Walter a. Shumaker and George Foster Longsdorf, ed. Callaghan and Company 1922) (1901) .................................33, 34

TREATISE ON THE PLEAS OF THE CROWN (Leach ed., 6th ed. 1788)..........37

F. Wharton, A Treatise on the Criminal Law of the United States (1852)..33, 38, 39

James Wilson, WORKS OF THE HONOURABLE JAMES WILSON (Bird Wilson ed., 1804) ................................................................................................34, 37

**INTRODUCTION**

Russell Fouts and Tan Miguel Tolentino ("Plaintiffs" or "Appellants") appeal from the district court's grant of summary judgement to the Defendant Rob Bonta, in his Official Capacity as the Attorney General for the State of California ("California") in their challenge to the State of California's ban on the possession of billies/batons[1]. Plaintiffs are both military veterans. Both have received training in the use of batons. Plaintiffs Fouts received training while working as a security guard. ER069. And Plaintiff Tolentino received training while serving as a military police officer and through martial arts training. ER066.

Plaintiffs wish to purchase collapsible batons as well as any other batons typically issued to police officer. ER066, ER069. They wish to own them for self-defense and other lawful purposes in their home and would acquire, possess, carry and where appropriate use a baton/billy to protect themselves. ER081-ER082. Thus, they have raised both an as-applied challenge and a facial challenge to California

---

[1] The offending statutes themselves refer to the items they prohibit as a "billy". Throughout this brief, Plaintiffs refer to these arms as batons because it more accurately describes the weapons they wish to own. California agrees that the term billy and baton mean the same thing for purposes of this litigation. *See* ER041.

Penal Code § 22210 and all other relevant statutes which restrict the ownership of batons[2]. *See* ER083 (Prayer for Relief).

California's baton ban was first enacted in 1917. ER038-ER040. The trial court erroneously found that it was bound by this Court's precedent to find that California's ban on batons is longstanding. This Court's precedent expressly finds that twentieth century laws are not longstanding. "We are not inclined to review twentieth-century developments in detail, in part because they may be less reliable as evidence of the original meaning of the American right to keep and bear arms." *Young v. Hawaii*, 992 F.3d 765, 811 (9th Cir. 2021). Therefore, courts should look to see what restrictions were permissible in 1791 when the Second Amendment was ratified to determine what laws are longstanding. Even if it were permissible for the trial court to look to more recent laws, it was impermissible for the trial court to cite to bans on the carrying of batons and prohibition on their use in crime to justify a ban on the possession of batons in the home for self-defense. The lower court's order can be reversed on those grounds alone.

However, as this Court will likely address Plaintiffs' claims in full, it is important to note that the lower court order also contained several mistakes

---

[2] California Penal Code section 16590(m) designates a billy as a "generally prohibited weapon." A billy is also designated as a "nuisance," subject to confiscation and summary destruction by law enforcement under California Penal Code section 18010(b) pursuant to Cal. Penal Code § 22290.

regarding the record. Notably, the trial court's order suggests that Plaintiffs wish to own an older style billy weapon which is no longer in fashion. The Court selectively quotes from Plaintiffs' declarations to justify this position. ("I desire to purchase the same type of baton/billy that policemen are usually issued."). The full quote in both declarations is "I desire to purchase the same type of baton/billy that policemen are usually issued and an expandable baton for self-defense and other lawful purposes for use in my home, business, while traveling between these locations and in all other lawful locations." ER066, ER069. The State agrees that collapsible batons are prohibited under the challenged statutes. ER048-ER049. And California typically issues them as well as fixed batons to its police officers. ER048-ER049. The trial court's order agrees that collapsible batons are typically issued to police officers but inexplicably ignored the evidenced provided to it by the State that fixed batons still are commonly issued as well. ("Nevertheless, while police no longer carry a billy on their equipment belt, preferring instead a collapsible metal baton[.]") ER025.

The trial court's failure to grapple with the record before it may have contributed to its next error which is its statement made without any analysis that batons are "dangerous and unusual" weapons. ER013. Neither modern collapsible batons or traditional batons/billies are dangerous and unusual weapons pursuant to this Circuit's precedent. And as shown below, the term as used in *District of*

*Columbia v. Heller,* 554 U.S. 570 (2008), refers to prohibitions on particular manners of carry and does not concern the particular type of "arm."

As will be fully argued below, batons are constitutionally protected arms. The arms Plaintiffs wish to own are currently typically used for lawful purposes. California's ban on these arms is not longstanding. Therefore, its ban on in the home possession is subject to constitutional scrutiny. Under any level of scrutiny, California can not justify a ban on an arm which is much less deadly than the handguns that the Supreme Court found could not be banned in *Heller*. The trial court's decision should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

The district court's final judgment was entered on September 22, 2021. *See* ER037. The Appellants timely filed a notice of appeal on September 23, 2021. See ER003. *See also* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUE FOR REVIEW

1. Does California's restrictions on the manufacture, sale, transfer, possession, or transportation in the State of any baton comport with the Second Amendment to the United States Constitution? *See* Cal. Penal Code §§ 22210; 16590(m); 22290.

# STATEMENT OF THE CASE

## I. California Law Bans the Ownership and Possession of Batons in the Home

California Penal Code § 22210, in relevant part, prohibits the ownership of billies which are also known as batons. California Penal Code section 16590(m) designates a billy as a "generally prohibited weapon." A billy is also designated a] "nuisance," subject to confiscation and summary destruction by law enforcement under California Penal Code section 18010(b) pursuant to Cal. Penal Code § 22290. These laws amount to an unconstitutional infringement on Plaintiffs' Second Amendment rights. They are challenged in this lawsuit.

## II. Procedural History

### A. Plaintiffs' Constitutional Challenge to California's Baton Ban

Plaintiffs filed their Complaint for Declaratory and Injunctive Relief on September 1, 2019. against Defendant-Appellee Xavier Becerra, in his Official Capacity as the Attorney General of the State of California.[3] ER071-ER088. The Complaint asserted that California's ban on batons violates Plaintiffs' Second Amendment rights and sought an Order declaring Cal. Penal Code §§ 22210 and all other relevant statutes unconstitutional and violative of the Second Amendment as-

---

[3] The Defendant was automatically substituted under Fed. R. Civ. Pro. 25(d) to the current Attorney General, Rob Bonta.

applied to them and facially. ER082-ER083. The Complaint also sought injunctive relief via an Order, preliminarily and permanently enjoining the Defendant and all those in concert with Defendant, from enforcing the offending statutes as applied to them and the general public. ER083.

## B. The District Court's Grant of Defendant's Motion for Summary Judgment and Entry of Judgment

On August 11, 2020, Plaintiffs filed their Motion for Summary Judgment on all claims (ECF# 21). Defendant filed his Motion for Summary Judgment on all claims on August 11, 2020 (ECF# 22). After briefing, but without oral argument, on September 22, 2021, the district court issued an Order Denying Plaintiffs' Motion for Summary Judgement and granting Defendant's Motion for Summary Judgment (ER008-ER036) and entered judgment in favor of Defendant. ER037.

### 1. Summary of the District Court's Order

The district court upheld California's ban on the possession of batons by holding that "[u]nder controlling precedent precluding further analysis, because the 104-year-old regulation is longstanding, it is therefore beyond the sweep of the Second Amendment. Plaintiffs' motion for summary judgment is denied and Defendant's cross motion for summary judgment is granted." ER035-ER036.

### 2. The District Court's Judgment

The district court entered final judgment in favor of Defendant-Appellee on September 22, 2021. ER037.

## SUMMARY OF THE ARGUMENT

Plaintiffs wish to possess collapsible batons and other batons typically issued to law enforcement for purposes of lawful self-defense. The State of California bans their possession. This ban violates the Second Amendment. The Second Amendment protects the possession of arms which are typically used for lawful purposes. Batons are bearable arms. *Heller* creates a presumption that a bearable arm is used for lawful purposes. California has made no attempt to rebut that presumption. Nor could they because batons are commonly sold throughout the vast majority of the United States to both civilians and police. Therefore, the batons which Plaintiffs wish to obtain are constitutionally protected.

California contends that the law at issue evades review because it is longstanding. That is because California's baton ban began in 1917. ER038-ER040. California believes that a law of this age falls within *Heller*'s longstanding language, and is thus, outside of the Second Amendment's protection. This argument is a misapplication of the longstanding doctrine. The government may only prohibit carrying in "'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected'" *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014). In this circuit, "[w]e are not inclined to review twentieth-century developments in detail, in part because they may be less reliable as evidence of the original meaning of the American right to keep and bear arms." *Young v. Hawaii*,

992 F.3d 765, 811 (9th Cir. 2021). The original meaning of the American right to keep and bear arms is determine by the scope of the right as envisioned by the Framers at the time of Ratification of the Second Amendment in 1791. "'[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Caetano v. Massachusetts*, 577 U.S. 411 (2016). The trial court erred in relying on a string of state laws which ban the carrying of batons. First, these bans are too recent to be relevant. Second, even if the laws cited to were old enough to be relevant, they are not relevant because they are bans on carry and not possession. Others deal with the criminalizing the use of batons while engaged in criminal acts, and have no relevance in analyzing a ban on possession for lawful self-defense. Thus, most of the laws which the trial court relied upon are inapposite. The trial court was only able to identify two other states with baton bans in the early twentieth century. Even if early twentieth century laws could demonstrate a longstanding regulation, three states demonstrate outliers, not a constitutional rule. California's baton ban is not long standing.

California also claims that batons are not protected by the Second Amendment because they are dangerous and unusual weapons. In this circuit, the only case to address the question is *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) which found machine guns are dangerous and unusual weapons. Unlike machine

guns which are far more dangerous than the handguns at issue in *Heller*, batons are much less deadly than handguns.

Put simply, the California laws at issue ban the possession of clubs in the home. While Plaintiffs concedes that the statute have been used to prosecute some esoteric types of clubs, as a general matter, clubs are not unusual weapons. Furthermore, there can be no argument that the arms at issue in Plaintiffs' as-applied challenge are unusual weapons. Collapsible batons and other policeman batons are extremely common arms and are not "unusual" weapons under this Court's precedent.

More to the point, the term dangerous and unusual weapons as used by *Heller* does not apply to the intrinsic qualities of any weapon. Rather it applies to types of conduct with arms. A historical analysis of the phrase is available in the argument section of this brief. Therefore, batons cannot be dangerous and unusual because the term does not refer to types of arms.

Since batons do not fall into one of the narrow carveouts made by *Heller*, batons are constitutionally protected arms. The State of California's ban on batons is unconstitutional because under any level of scrutiny that this Court may employ, the State does not have a sufficient government interest to ban them. And even if it does, a complete ban on them is not tailored to serve that government interest. Therefore, their ban is unconstitutional.

## ARGUMENT

### I.    Legal Standard

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999). This Court reviews de novo a district court's ruling on summary judgment. *Albino v. Baca*, 747 F.3d 1162, 1173 (9th Cir. 2014).

### II.   California's Ban on Batons Violates the Second Amendment

### A. California's Ban on Batons is Not Longstanding[4]

The trial court erred in holding that California's ban on batons is a longstanding law. California's ban on batons began in 1917. ER038-ER040. A law from the early 20th century is not longstanding. In this Circuit, longstanding laws

---

[4] The United States Supreme Court granted certiorari to review a New York handgun licensing law bearing a 1913 vintage. *See N.Y. State Rifle & Pistol Ass'n v. Corlett*, 209 L.Ed.2d 590 (U.S. 2021) (granting certiorari). The question in *NY Rifle II* is not whether this older law is a longstanding law, and thus, immune from review, but "[w]hether the State's denial of petitioners' applications for concealed-carry licenses for self-defense violated the Second Amendment." If, as the district court contended, a 1917 law is per se longstanding and requires no further analysis, it makes no sense that the Supreme Court would grant a case of an <u>earlier</u> vintage law and not treat it the same way.

refer to laws in existence from the ratification of the Second Amendment. "We are not inclined to review twentieth-century developments in detail, in part because they may be less reliable as evidence of the original meaning of the American right to keep and bear arms." *Young v. Hawaii*, 992 F.3d 765, 811 (9th Cir. 2021). This is a faithful reading of *Heller*.

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35. Thus, "the Supreme Court has taught in *Heller I* that legal regulations of possession or carrying that are 'longstanding'…reflect limits to the preexisting right protected by the Amendment." *Wrenn v. District of Columbia,* 864 F.3d 650, 659 (DC Cir. 2017). That means we look to the "historical background of the Second Amendment." *Heller*, 554 U.S. at 592. For example, *Heller* cites to prohibitions on "felons and the mentally ill" as examples of longstanding prohibitions because colonial and early English societies prohibited those individuals from owning firearms. *Id* at 626.

At common law, there were there were three classes of crime: treason, felony and misdemeanor. Felonies were those offenses which occasioned forfeiture of the lands and goods of the offender and to which might be added death or other punishment according to the degree of guilt. 4. Bl. Comm. 94; *Fasset v. Smith*, 23 N.Y. 257(1891); *Bannon v. U.S*., 156 U.S. 464 (1895). The felonies were murder,

manslaughter, rape, sodomy, robbery, larceny, arson, burglary, and arguably mayhem. *See* William Lawrence Clark, William Lawrence Marshal New York, Fred B Rothman & Co., A Treatise on the Law of Crime (1905) at 12. All other crimes, excepting treason, were misdemeanors.

"[A]t the time of the founding, 'the right to arms was inextricably and multifariously linked to that of civic virtu (i.e., the virtuous citizenry),' and that '[o]ne implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally imbalanced, are deemed incapable of virtue.'" *NRA v. BATF*, 700 F.3d 185, 201 (5th Cir. 2012) (citation omitted). Historically, the State disarmed non-virtuous citizens and those like children or the mentally unbalanced, who were deemed incapable of virtue. *See, e.g.* Robert Dowlut, The Right to Arms: Does the Constitution or the Predilection of Judges Reign? 36 OKLA. L.REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."). *Heller* cites to these colonial prohibitions on felons and the mentally ill as part of its historical analysis to explain the scope of the Second Amendment right in 1791.

12

Similarly, this Circuit's precedent commands that we look at the scope of the right in 1791.[5] Since this Court issued its recent opinion in *Young*, a trial court in Hawaii has already properly applied this Court's precedent. In evaluating a challenge to a registration law from 1934, it found the law at issue was not longstanding because "a handful of similar laws from the 1930s, without more, is insufficient to establish that the State of Hawaii's law belongs to a 'longstanding' historical tradition of 'presumptively lawful' firearm prohibitions." *Yukutake v. Conners*, No. 19-00578 JMS-RT, 2021 U.S. Dist. LEXIS 153586, at *11 (D. Haw. Aug. 16, 2021). Similarly, a law from 1917 is not part of a longstanding tradition because there is no evidence that this law is reflective of a tradition that goes back to the time of the Founding.

Support for the propriety of this Circuit's precedent is found in other circuit's precedent. The Fifth Circuit looked to colonial laws to uphold a restriction on young

---

[5] While it is true that dicta from *Fyock* suggests that "early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record", this dicta is not binding on this court. *Fyock v. City of Sunnyvale,* 779 F.3d 991, 997 (9th Cir. 2015). "When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound." *Seminole Tribe v. Fla.*, 517 U.S. 44, 67 (1996). Here, *Fyock's* dicta about longstanding regulation was not necessary to its result. In *Fyock,* the court found that the magazine law at issue was not longstanding, that high capacity magazines are protected by the Second Amendment, and then applied intermediate scrutiny to uphold the ban. *Fyock*, 779 F.3d at 1001.

adults purchasing handguns. The Fifth Circuit's extensive historical analysis of the founding era determined "the term 'minor' or 'infant'—as those terms were historically understood—applied to persons under the age of 21." *NRA*, 700 F.3d at 201. It concluded that if "a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18-to-20-year-olds as 'minors,' then it stands to reason that the citizen would have supported restricting an 18-to-20-year-old's right to keep and bear arms." *Id.* at 202. Even then, "in an abundance of caution", the Fifth Circuit assumed intermediate scrutiny applied to the restriction before upholding it. *Id.* at 204.

Similarly, in *Heller II*, the D.C. Circuit "presume[d]" that "the District's basic registration requirement…does not impinge upon the right protected by the Second Amendment." *Heller v. District of Columbia*, 670 F.3d 1244, 1254 (D.C. Cir. 2011). It only upheld that presumption because it "[found] no basis in either the historical record or the record of this case to rebut that presumption" and because the "basic registration requirements are self-evidently de minimis." *Heller II*, 670 F.3d at 1255. Here, the historical record clearly demonstrates that bans on batons did not exist during the Founding Era. And rather than being de minimis, California completely bans a protected arm. And is thus the most restrictive law possible. "That an unconstitutional action has been taken before surely does not render that same action

14

any less unconstitutional at a later date." *Powell v. McCormack,* 395 U.S. 486, 546-47 (1969). A law cannot have been unconstitutional, then passed and made constitutional solely by the passage of time.

Either a law is constitutional as understood by the Founders or it is not. "A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). More to the point, adopting the lower court's brightline rule would defeat the whole purpose of constitutional law which is to give equal treatment to civil rights throughout the Union. It simply can't be that Connecticut's baton law is unconstitutional and California's is constitutional based on the date their respective legislatures passed their baton bans. There is no area of constitutional law that allows for the grandfathering of unconstitutional regimes. This Court should not endorse the lower court's legal theory which runs contrary to the Supreme Court's admonishment that the Second Amendment is not a second-class right, "subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause." *McDonald v. City of Chi.*, 561 U.S. 742, 780 (2010).

Even if this Court finds that a large number of early twentieth century laws could justify treating a law as longstanding, this Court should reject the lower court's attempt to use inapposite laws to justify upholding California law. The trial court's

decision is also deeply flawed because it relied on a series of state laws which have absolutely nothing to do with a ban on the possession of batons to justify its position California's law is longstanding. "The weapon known as a billy has been the subject of regulation in at least twenty states". ER033.

The vast majority of the cases the trial court relied upon deal with restrictions on the carry of batons or enhancements for their use during the commission of a crime. Here, Plaintiffs' challenge a ban on possession of batons. The trial court even relied on a Wisconsin law which "provides for the issuing of a license to a person to be able to lawfully carry concealed a "billy club."" ER033. By the trial court's logic, allowing any law-abiding citizen the right to carry after being issued a license is the same as banning the possession of an arm. That reasoning was already rejected in *Heller*. The trial court was only able to cite to two other baton bans (New York and Nevada) from the early twentieth century to justify its reasoning. ER031. It also inexplicably citied to a few modern bans to justify its conclusion that California's ban is longstanding. These being a Rhode Island ban from 1956 (ER032), an Oregon law the trial court failed to give a date for which was struck as unconstitutional (ER032), and a New Jersey law which the trial court failed to give a date for. ER032.

Unlike the trial court appealed from, other trial courts have been able to correctly follow this Court's precedent. In evaluating a challenge to two registration law from 1934 post-*Young*, a federal court in Hawaii rejected the claim that they

were longstanding. "Thus, even if these laws did provide evidence of founding-era understanding of lawful firearm prohibitions, it is not clear that their existence supports Defendant's argument that the State of Hawaii's law falls within that historical tradition." *Yukutake,* 2021 U.S. Dist. LEXIS 153586, at *13.

Like the Hawaii laws at issue in *Yukutake*, California's ban on batons is not longstanding. It is not longstanding because there was not a history of prohibiting the possession of batons during the Founding Era. The trial court acknowledged colonial bans on batons did not exist. This is for the simple reason that it believes, "the weapon known as a billy apparently did not exist at the time of the founding of our nation". ER021. However, clubs and other weapon shaped sticks are covered by the billy law and were in existence at the time of the Founding. *State v. Kessler*, 289 Or. 359, 371–72 (1980) ("The club is considered the first personal weapon fashioned by humans.") (citing O. Hogg, Clubs to Cannon 19 (1968)). And these were certainly not prohibited arms:

> In the press, Samuel Adams argued that the slain Mr. Attucks "was leaning upon his stick when he fell, which certainly was not a threatening posture: It may be supposed that he had as good right, by the law of the land, to carry a stick for his own and his neighbor's defence, in a time of danger, as the Soldier who shot him had, to be arm'd with musquet and ball, for the defence of himself and his friend the Centinel."

– Stephen P. Halbrook, The Founders' Second Amendment 25 (2008), quoting 2 The Writings of Samuel Adams 119 (1904).

The trial court's analysis argues for a legal regime that if there were any regulation of an arm during the 19th or early 20th century, then that is grounds to justify a complete ban on an arm without the need for constitutional scrutiny. If the Supreme Court had followed the trial court's reasoning, then *Heller* would have turned out the other way. This is because there has always been regulation of firearms even during the colonial era. "The historical record shows that gun safety regulation was commonplace in the colonies". *NRA*, 700 F.3d at 200. Despite this, the Supreme Court found in *Heller* that the District of Columbia's ban on handguns was subject to constitutional scrutiny and ultimately, the ban was unconstitutional.

Even if a law from the early 20th century is longstanding and thus, presumptively lawful, Plaintiffs have rebutted this presumption. "Unless flagged as irrebuttable, presumptions are rebuttable." *Binderup v. AG of United States*, 836 F.3d 336, 350 (3d Cir. 2016) (citations omitted). In *Binderup*, the Third Circuit reviewed an as-applied challenge by a felon to the federal ban on felons owning firearms. It first described its previous precedent to explain how to rebut a presumption of constitutionality:

> In that regard, we first determined that "*Heller*'s statement regarding the presumptive validity of felon gun dispossession statutes does not foreclose' an as-applied challenge." … For the reasons discussed, we concluded that "[t]o raise a successful as-applied challenge, [one] must present facts about himself and his background that distinguish his

18

circumstances from those of persons historically barred from Second Amendment protections."

*Binderup*, 836 F.3d at 362 (citations and punctuation omitted).

This is in accord with the Sixth Circuit's reasoning in *Tyler v. Hillsdale Cnty. Sheriff's Dep't,* 837 F.3d 678, 690 (6th Cir.) which found some people who have been involuntarily committed may have Second Amendment rights. "As the Seventh Circuit has recognized, the *Heller* Court's observation regarding the presumptive lawfulness of longstanding bans is precautionary, not conclusive…[*United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)] (emphasis added)." *Tyler*, 837 F.3d at 687. "In the face of what is at best ambiguous historical support, it would be peculiar to conclude that [18 U.S.C.] § 922(g)(4) does not burden conduct within the ambit of the Second Amendment as historically understood based on nothing more than *Heller*'s observation that such a regulation is 'presumptively lawful.' 554 U.S. at 627 n.26. We proceed to step two, then, with an understanding that people who have been involuntarily committed are not categorically unprotected by the Second Amendment." *Id.* at 690.

By analogy, this Court should find that Plaintiffs have rebutted the presumption of constitutionality if it finds California's ban on batons longstanding. First, the traditional justification for banning batons is that they were arms not used for lawful purposes. This justification can be rebutted on two grounds. Whatever the case was in 1917, the batons that Plaintiffs wish to buy are not typically used for

criminal purposes. Rather they serve a traditional militia function. "[*United States v. Miller,* 307 U.S. 174 (1939)] implies that possession by a law-abiding citizen of a weapon that could be part of the ordinary military equipment for a militia member, or that would contribute to the common defense, is protected by the Second Amendment," *Duncan v. Becerra,* 265 F. Supp. 3d 1106, 1116 (S.D. Cal. 2017). Historically, policing was a militia function. "Furthermore, the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; see, e.g., D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. Rev. 1359, 1534 demonstrates the weapon's traditional military utility." *State v. Deciccio,* 315 Conn. 79, 133 (2014). This is especially true regarding Plaintiffs' as-applied challenge because Plaintiffs wish to own "expandable baton[s]". ER066, ER069. Arms which were not in existence in 1917. Therefore, it is not possible that there is a longstanding tradition of prohibiting these arms.

Plaintiffs have shown that batons are less dangerous than arms which are legal to own. They have shown that there was no colonial era tradition of banning batons. And they have shown that the modern era batons, especially the baton Plaintiffs state they wish to own in their declarations, are arms used for lawful self-defense and other traditional militia functions. ER066, ER069, ER061-ER062, ER048-ER051. For all these reasons, even if this Court finds that California's baton ban is

longstanding and thus, presumptively constitutional, it should find that Plaintiffs have rebutted that presumption and subject it to constitutional scrutiny.

### B. Batons Are Not Dangerous and Unusual

Batons are not "dangerous and unusual" weapons as the term has been used under this Circuit's precedent. In *United States v. Henry*, the Ninth Circuit held that:

> An object is "dangerous" when it is "likely to cause serious bodily harm." *Black's Law Dictionary* 451 (9th ed. 2009)… A machine gun is "unusual" because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986. Outside of a few government-related uses, machine guns largely exist on the black market.

*United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012).

An arm being merely dangerous "cannot be used to identify arms that fall outside the Second Amendment." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., concurring). "As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.* Thus, if it can be demonstrated that an arm is either usual or not dangerous it receives Second Amendment protection. As shown below, batons are neither dangerous nor unusual.

Arms such as batons are typically owned for lawful purposes and receive constitutional protection. Batons are widely owned in almost every state in the Union. Unlike the machine guns at issue in *Henry*, batons are legal to own in the

home in at least 46 states plus the District of Columbia.[6] Batons are a subset of clubs and are themselves typically used for lawful purposes. And the record demonstrates that they are possessed for self-defense. *See generally*, ER046-ER056 and ER057-064. While the record does not provide numerical data, the widespread legality and lawful typical use of batons are sufficient to establish they are in common use.[7] This is especially true here where numerical data simply does not exist because unlike firearms[8] and magazines, there is no single trade group that keeps track of baton

---

[6] Batons remain illegal in California, Colorado, and New York. The District of Columbia bans blackjacks, but not batons. *See* D.C. Code § 22-4514. Rhode Island arguably allows possession in the home, but due to the vagueness of the law, it is identified separately (*see* R.I. Gen. Laws § 11-47-2(a)(1), *but see* subsection (b) which allows the sale of the weapons listed in subsection (a) with "written authorization of the minor's parent or legal guardian". The district court stated that billies are illegal in New Jersey (ER032), but that is incorrect as the cited statute defines the term "weapon", to include firearms, which are undoubtedly not banned in New Jersey. *See State v. Montalvo*, 162 A.3d 270 (2017) ("Individuals may possess in their homes objects that serve multiple lawful purposes, including the purpose of anticipatory self-defense. In this case, Montalvo possessed at home a machete he used in his roofing job. He was lawfully entitled to possess that machete as a weapon in his home as a means of defending himself and his family from attack as well").

[7] *See* COMMENT: SECOND AMENDMENT DECISION RULES, NON-LETHAL WEAPONS, AND SELF-DEFENSE, 97 Marq. L. Rev. 853, 862 (Spring 2014): "The most common and easy-to-use weapons for self-defense purposes are batons. With the exception of some projectiles, blunt force objects are some of the oldest and most predominantly used non-lethal weapons because they can be easily manipulated and are inexpensive."

[8] Firearm sales are aggregated by the National Shooting Sports Foundation (NSSF). For example, *see* https://www.nssf.org/nssf-releases-firearms-production-figures/.

sales.[9]

More to the point, the burden was on California to demonstrate that batons are not constitutionally protected, and California has never done so. *Heller* holds there is a presumption that arms are constitutionally protected, and the burden is on the government to rebut that presumption. "*Heller* emphasizes that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms.' *Heller*, 554 U.S. at 582. In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *See New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015).

There is no dispute that batons are bearable arms because they can be held by a person to attack another person or to defend against an attack. Thus, the burden is on the government to show that they are not usual protected arms. Defendant has never attempted to rebut that presumption. The trial court correctly noted this. "Here, there is no evidence that a billy is uncommon or commonly owned only for unlawful purposes. Because the government bears the burden, these arms are presumptively lawful to own." ER015. This presumption aligns with reality.

---

[9] *See also* Symposium: The Second Amendment and the Right to Bear Arms After *D.C. v. Heller*: Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1480 (2009) ("… we're even more in the dark about the prevalence of nearly all weapons other than guns, such as fighting knives and billy clubs.").

There is evidence that batons are usual arms. "Peace offices employed by the California Department of Justice are generally issued the ASP expandable baton … [and] peace officers employed by other California law enforcement agencies may be issued different police batons…" ER044. Historically, policing was a militia function. "Furthermore, the widespread use of the baton by the police, who currently perform functions that were historically the province of the militia; see, e.g., D. Kopel, 'The Second Amendment in the Nineteenth Century,' 1998 BYU L. Rev. 1359, 1534 demonstrates the weapon's traditional military utility." *Deciccio,* 315 Conn. at 133. The Constitution as originally adopted granted to Congress the power – "[t]o provide for calling forth the Militia to **execute the Laws of the Union**, suppress Insurrections and repel Invasions." *Miller,* 307 U.S. at 178. (emphasis added). Batons are "'[a]rms' within the meaning of the second amendment because they are weapons with traditional military utility that are typically possessed by law-abiding citizens for lawful purposes, and they are neither especially dangerous nor unusual." *Deciccio*, 315 Conn. at 129.

Even if this Court were to find that batons are unusual, they still receive Second Amendment protection because an arm must be dangerous and unusual to lose its Second Amendment protection. And within the context of the dangerous and unusual analysis, batons are not "dangerous." That is because *Heller* established that handguns are not dangerous enough to be considered "dangerous" for this

24

analysis. And the State has conceded that batons are "generally less lethal than firearms…" ER051.

Because batons are less dangerous than handguns which the *Heller* court found to be the "quintessential self-defense weapon," they are not dangerous and unusual. *See Heller,* 554 U.S. at 629. Batons cannot therefore be legally "dangerous" and lose Second Amendment protection. Handguns are both concealable in the pocket and are much more dangerous than any type of baton. Batons do not have the devastating power of machineguns and simply are not dangerous pursuant to this Court's precedent in *Henry*.

The Connecticut Supreme Court has already found that batons are protected by the Second Amendment. In *State v. Deciccio*, 315 Conn. at 117, the court found that billies are protected by the Second Amendment and a complete ban on their possession is unconstitutional ("For these reasons, we are persuaded that the police baton that the defendant had in his vehicle is the kind of weapon traditionally used by the state for public safety purposes and is neither so dangerous nor so unusual as to fall outside the purview of the second amendment's right to keep and bear arms"). *Deciccio,* 315 Conn. at 133-134.

The Oregon Supreme Court's right to arms analysis "mirrors the model employed by the United States Supreme Court in *District of Columbia v. Heller*, supra, 554 U.S. 624-25". *See Deciccio* at 117. In *State v. Kessler*, 289 Ore. 359, 371

(1980), the Oregon Supreme Court found:

> The club is considered the first personal weapon fashioned by humans. O. Hogg, Clubs to Cannon 19 (1968). The club is still used today as a personal weapon, commonly carried by the police. ORS 166.510 prohibits possession of a "billy;" … The statute in this case, ORS 166.510, prohibits the mere possession of a club. The defendant concedes that the legislature could prohibit carrying a club in a public place in a concealed manner, but the defendant maintains that the legislature cannot prohibit all persons from possessing a club in the home. The defendant argued that a person may prefer to keep in his home a billy club rather than a firearm to defend against intruders. Our historical analysis of Article I, section 27, indicates that the drafters intended "arms" to include the hand-carried weapons commonly used by individuals for personal defense. The club is an effective, hand-carried weapon which cannot logically be excluded from this term. We hold that the defendant's possession of a billy club in his home is protected by Article I, section 27, of the Oregon Constitution.

In *State v. Blocker*, 291 Ore. 255 (1981), the Oregon Supreme Court extended this ruling to find private citizens have a right to possess billy clubs outside the home.

Federal courts have used a similar analysis to find other self-defense arms are protected by the Second Amendment. In *Maloney v. Singas*, 351 F. Supp. 3d 222 (S.D.N.Y. 2018), the United States District Court for the Southern District of New York struck the State of New York's ban on nunchucks as a violation of the Second Amendment. It held that nunchucks are protected by the Second Amendment because they are bearable arms that are typically used for lawful purposes. It then struck New York's ban because the State did not have an important government interest in banning these protected arms. A federal court in northern New York used a similar analysis to strike New York State's ban on electric arms. *See Avitabile v.*

*Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019). *People v. Webb,* 2019 IL 122951 struck Illinois's ban on taser ownership and carry by applying a categorical approach and *Webb* supports the use of a categorical approach in this case.[10]

### C. The Prohibition on Carrying Dangerous and Unusual Weapons Refers to Types of Conduct

This Court should also not find batons are dangerous and unusual weapons because the term historically did not apply to types of arms. *Heller*'s prohibition on the carrying of dangerous and unusual refers to a prohibition on certain types of conduct. Writing for the Court in *Heller*, Justice Scalia stated:

> [w]e also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." [*U.S. v. Miller*, 307 U.S. 174, 179 (1939)]. We think that limitation is fairly

---

[10] Knives designed for self-defense are also weapons protected by the Second Amendment. *See State v. Herrmann*, 873 N.W.2d 257 (Wis. Ct. App. 2015) (finding switchblades are protected by the Second Amendment and that Wisconsin's complete ban on their possession was unconstitutional); *State v. Deciccio*, 315 Conn. 79 (Conn. 2014) (dirks and batons protected by the Second Amendment as "typically possessed by law-abiding citizens for lawful purposes" and not "dangerous and unusual weapons"); *State v. Montalvo*, 162 A.3d 270 (2017) (in-the-home possession of machete-type knives protected by the Second Amendment); *State v. Griffin*, 2011 Del Super LEXIS 193, *26 n62 (Del Super Ct, May 16, 2011) (reversed and remanded on other grounds by *Griffin v. State*, 47 A.3d 487, 2012 Del. LEXIS 319 (Del., June 18, 2012) (the "right to keep and bear arms" under the Delaware Constitution extends to knives, and concluding that the Second Amendment right does the same); *City of Akron v. Rasdan*, 663 NE2d 947 (Ohio Ct. App., 1995) (concluding that the "right to keep and bear arms" under the Ohio Constitution extends to knives); *State v. Delgado*, 692 P.2d 610 (1984) (ban on the possession of switchblades violated the Oregon Constitution's right to arms).

supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Heller*, 554 U.S. at 627.

The prohibition on carrying dangerous and unusual weapons is derived from the Statute of Northampton 2 Edw. 3, c. 3 (1328) which is a statute that banned carrying in certain situations, such as affrays.

This law is cited by several of the commentators on which *Heller* relies. For example, Timothy Cunningham is cited by the *Heller* Court (*see* 554 U.S. at 581). Timothy Cunningham's 1789 law dictionary defines "affray" as follows:

> Affray, Is derived from the French word effrayer, to affright, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror of others; and so is the word used in the statute of Northampton []. It is now commonly taken for a skirmish, or fighting between two or more. … Yet, as it is there said, they differ in this, that where an assault is but a wrong to the party, an affray is wrong to the commonwealth, and therefore both inquirable and punishable in a leet. … Beside this signification, it may be taken for a terror wrought in the subject by an unlawful fight or violence, &c. as if a man shew himself furnished with armour or weapons not usually worn, it may strike a fear into others unarmed; and so it is used in flat 2 Ed 3 c 3. But altho' no bare words, in the judgement of law, carry in them so much terror as to amount to an affray, yet it seems certain, than in some cases there may be an affray, where there is no actual violence, as where a man arms himself with dangerous and unusual weapons in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at the Common law and is strictly prohibited by Statute.

*See* Timothy Cunningham, A new and complete law-dictionary, Affray, 1789.

Cunningham defines riding armed, with dangerous and unusual weapons as:

an offense at Common law. [citation omitted] By the stat. 2 Ed. 3. Cap. 3. None shall ride armed by day or night to the terror of the people; or come with force and arms before the King''s justices...but men may wear common arms according to their quality and fashion, and have attendants with them armed agreeable to their characters; all persons may ride or go armed take felons, suppress riots, execute the King's process…

Cunningham, *supra*, Riding.

As shown below, this is a prohibition against carrying in a threatening manner which disturbs the public, not simply carrying a weapon outside one's home, whereas carrying in an unusual manner was generally not allowed. The Supreme Court of North Carolina correctly interpreted the dangerous and unusual language in the historical context as to how it was originally understood.  *See e.g. State v. Dawson*, 272 N.C. 535 (1968).[11]

---

[11] "It has been remarked that a double-barrel gun, or any other gun, cannot in this country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort. But we do not feel the force of this criticism. A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements -- as a part of his dress -- and never, we trust, will the day come when any deadly weapon  will be worn or wielded in our peace-loving and law-abiding State, as an appendage of manly equipment. But although a gun is an 'unusual weapon,' it is to be remembered that the carrying of a gun, *per se*, constitutes no offense. For any lawful purpose -- either of business or amusement -- the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people." *Dawson*, 272 N.C. at 544-45 (citation omitted).

The term "dangerous weapon", in the English common law, is a legal term of art that usually included weapons designed or able to kill human beings. In this context, the Common Law's definition of "dangerous" was any item that could be used to take human life through physical force. *See United States v. Hare*, 26 F. Cas. 148, 163-64 (C.C.D. Md.1818) ("[S]howing weapons calculated to take life, such as pistols or dirks, putting [the victim] in fear of his life … is … the use of dangerous weapons."). *See also The King v. Oneby* 92 E.R. 465 (Court of the King's Bench 1727) ("Any dangerous weapon, as a pistol, hammer, large stone, &c. which in probability might kill B. or do him some great bodily hurt."). Therefore, as the trial judge said in a separate case, "[a]t bottom, guns are dangerous." *Miller v. Bonta*, No. 19-cv-1537-BEN (JLB), 2021 U.S. Dist. LEXIS 105640, at *105 (S.D. Cal. June 4, 2021). This is historically supported because common arms, such as pistols, are "dangerous" arms and all arms are "dangerous" within this context.

Timothy Cunningham's 1789 law dictionary defined an affray as "to affright, and it formerly meant no more, as where persons appeared with armour or weapons not usually worn, to the terror." When discussing forcible entry or detainer, Blackstone stated, "so that the entry now allowed by law is a peaceable one; that forbidden is such as is carried on and maintained, with force, with violence, and unusual weapons." 5 St. George Tucker, Blackstone's Commentaries: with Notes of Reference, to the Constitution and the Laws, of the Federal Government of the

United States; and of the Commonwealth of Virginia 148 (1803). It would make little sense to think that the distinction was being drawn between peaceable entry and entry with weapons that are difficult to purchase or hard to find. Instead, the term "unusual weapons" means weapons that are being used in a threatening or shocking manner, or weapons that are being used to facilitate an unlawful endeavor.

This position is supported by case law. In an English case, *Baron Snigge v. Shirton*, a tenant was in a dispute with his landlord, and "kept the possession [of the house he rented] with drum, guns, and halberts". *See generally Baron Snigge v. Shirton* 79 E.R. 173 (1607). "(The drum was only to give notice if any came to enter, but no body offered to enter.)" *Id.* This was considered keeping "his house with unusual weapons against a purchaser". *Id*.

In another English case, a sailor fired warning shots with a "musqet and ball" across the bow of another ship as a signal and killed a man. *See generally Rex v. Rowland Phillips* 98 E.R. (1385). The Court found "[t]he firing was not done in an uncommon manner, or with unusual weapons." *Id.* And held "[i]t is impossible upon this special verdict to say, that the defendant is guilty of more than manslaughter. For it is expressly found, that he fired in the usual manner to bring vessels to, and to hit the hallyards." *Id*. In both cases, the weapons were in common use at the time. However, in one case, the weapon was unusual, while in the other case, it was not. The relevant difference between the cases is whether the use of force was reasonable.

This definition of unusual is supported by Blackstone's discussion of forfeited recognizance. "A recognizance for the good behavior may be forfeited … by going armed with unusual attendance, to the terror of the people." 5 Blackstone 256 (1803). At Common Law, just as people could legally own weapons, large groups of people could legally gather, so long as their purpose was lawful. It is when those groups of people became threatening (or terrifying), that those groups were labeled as unusual attendance to the terror of the public and became unlawful. Similarly, when the manner in which one carries a weapon becomes threatening, it is labeled an unusual weapon.

When used to describe weapons, the word, "unusual" is not being used in a different way than when it is being used to describe attendance. Blackstone states, "Any justice of the peace may… bind all those… who make any affray; or threaten to kill or beat another; or contend together with hot and angry words; or go about with unusual weapons or attendance, to the terror of the people" 5 Blackstone 254 (1803). Just as the common law is not outlawing the assembly of unusual people, the common law is not referring to the type of weapon involved when it mentions unusual weapons. The historical phrase, "dangerous and unusual weapons" does not refer to classes of weapons as the lower courts have erroneously held. Rather it describes a class of behavior when carrying weapons.

Other, stricter laws outlawed specific types of weapons for certain individuals. "The keeping or carrying any gun-powder, shot, club, or other weapon, whatsoever, offensive or defensive, by any negroe or mulatto whatsoever (except in certain special cases) is an offence, for which the gun or other weapon may be seized, and the offender whipped, by order of a justice of the peace." 4 Blackstone 175 (1803). Similarly, King George III issued a statute outlawing the possession of "pistol, hanger, cutlass, bludgeon, or other offensive weapon with intent feloniously". 5 Blackstone 169 (1803). And declared, "such a person shall be deemed a rogue and a vagabond". *Id*. If the term dangerous and unusual weapons meant a type of prohibited arm, then the legislature would have used that phrase with these laws. Rather the carrying of dangerous and unusual weapons refers to a class of conduct with protected arms.

Historically, this class of conduct was that which caused terror. Terror in this context means carrying in a threatening manner. A 1675 dictionary defined terror as "dread, great fear or fright". An Universal Etymological Dictionary (R. Ware, W. Innys and J. Richardson, J. Knapton (and twelve others)) (1675). An affray may not be committed in private because then, the public would not be terrified. F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852). The Cyclopedia Law Dictionary from 1922 defined terror as:

> That state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe; affright from apparent

> danger. One of the constituents of the offense of riot is that the acts of the persons engaged in it should be to the terror of the people, as a show of arms, threatening speeches, or turbulent gestures; but it is not requisite, in order to constitute this crime, that personal violence should be committed.

The Cyclopedia Law Dictionary (Walter a. Shumaker and George Foster Longsdorf, ed. Callaghan and Company 1922) (1901).

The Collegiate Law Dictionary from 1925 defined terror as "1. The state of mind which arises from the event or phenomenon that may serve as a prognostic of some catastrophe. 2. Affright from apparent danger." The Collegiate Law Dictionary (James John Lewis ed., The American Law Book Company 1925) (1925). Historically, "terror" was an apprehension of harm to come. In describing a mugging, James Wilson wrote, "If one assault another with such circumstances of terror as to put him in fear, and he, in consequence of his fear, deliver his money; this is a sufficient degree of violence". 3 James Wilson, WORKS OF THE HONOURABLE JAMES WILSON 59 (Bird Wilson ed., 1804)

Later, Wilson described arson as "a crime of deep malignity … The confusion and terror which attend arson, and the continued apprehension which follows it, are mischiefs frequently more distressing than even the loss of the property." *Id* at 63. In describing an ideal judge, Wilson writes, "He ought, indeed, to be a terror to evil doers". 2 Wilson 300 (1804). Wilson wrote, in describing interrogation methods, "terror is frequently added to fraud. The practice… is said… to have been derived its origin from the customs of the inquisition." 3 Wilson 155 (1804)

34

Giles Jacob's law dictionary states, when describing a legal device known as a Surety of the Peace (which appears to be a promise not to harm), "the demand of the Surety of the Peace ought to be soon after the cause of fear; for the suffering much time to pass before it is demanded, shews that the party has been under no great terror." Giles Jacob, The law-dictionary 149 (P. Bryne 1811 first American from the second London edition) (1811). Jacob further described the difference between mere fear and terror while defining the word, "robbery". Jacob wrote,

> [a]nd when it is laid to be done by putting in fear, this does not imply any great degree of terror, or affright in the party robbed. It is enough that so much force, or threatening by word or gesture, be used, as might create an apprehension of danger, or induce a man to part with his property without or against his consent.

*Id* at 546. From these sources, "terror" is more than mere apprehension of danger; it might more aptly be described as the apprehension of an extreme danger or a catastrophe.

Some American case law comports with the above view. A 1795 case describes "a defence based upon the ground of duress and terror". *U.S. v. Vigol*, 2 U.S. 346 (1795). Another 1795 case stated, "raising a body of men to …oppose and prevent by force and terror, the execution of a law, is an act of levying war." *U.S. v. Mitchel*, 2 U.S. 348 (Pennsylvania circuit court 1795). However, other old American cases treat the word "terror" as if it were synonymous with the word "threat". One case mentioned people "armed with all the terrors of forfeiture" *Warder v. Arell* 2 Va. 282 (1796). Another case mentioned "the terror of public censure". *State v.*

35

*Norris* 2 N.C. 429 (1796). A third case mentioned "the terrors of a law-suit". *Neilson & Sarrazin v. Dickenson* 1 Des. 133 (1785).

Either way, as historically understood, the prohibition against carrying dangerous and unusual weapons requires an arm to be carried in a threatening manner. The longstanding prohibition on the carrying of "dangerous and unusual weapons" thus refers to types of conduct with weapons. "A man has a clear right to protect himself when he is going singly or in a small party upon the road where he is traveling or going for the ordinary purposes of business. But I have no difficulty in saying you have no right to carry arms to a public meeting, if the number of arms which are so carried are calculated to produce terror and alarm". *Rex v. Dewhurst*, 1 State Trials, New Series 529 (1820). A necessary element of this common law crime of affray, to which the "dangerous and unusual" prohibition refers, had always required that the arms be used or carried in such manner as to terrorize the population, rather than in the manner suitable for ordinary self-defense.

*Heller*'s first source on the topic, Blackstone, offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, English courts had long limited to prohibit the carrying

of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, DET. L. C. REV. 789, 795 (1982) (citing *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)). "[N]o wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people," by causing "suspicion of an intention to commit an[] act of violence or disturbance of the peace." TREATISE ON THE PLEAS OF THE CROWN, ch. 63, § 9 (Leach ed., 6th ed. 1788); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s additional citations regarding the "dangerous and unusual" doctrine are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*." 3 Wilson 79 (1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people*." John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

Charles Humphreys stated, that:

[r]iding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land … But here

37

> it should be remembered, that in this country the constitution guar[]anties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also Heller*, at 588 n.10 (quoting same). It is the *manner* of how the right is exercised, not the type of weapon that is carried, that constitutes the crime. Said another way, just because a firearm or other weapon is in common usage at the time does not make the *manner* in which the right is exercised excused or excusable simply due to the type of firearm or weapon carried.

"[T]here may be an affray … where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But:

> it has been holden, that no wearing of arms is within [meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons … in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id*. at 272. The Supreme Court then referred to F. Wharton's, A Treatise on the Criminal Law of the United States:

> An affray, as has been noticed, is the fighting of two or more persons in some public place, to the terror of the citizens. (footnote omitted)

> There is a difference between a sudden affray and a sudden attack. An affray means something like a mutual contest, suddenly excited, without any apparent intention to do any great bodily harm. (footnote omitted). … yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute. For by statute 2 Edw. 3., s. 3, in force in several of the United States, it is enacted…

F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

Wharton also includes a manner requirement to the rule against dangerous and unusual weapons. If a man armed himself with a dangerous and unusual weapon in such a manner that did not naturally cause a terror to the people, he would not be guilty of an affray. After discussing the King's statute, Wharton stated:

> It has been said generally, that the public and open exhibition of dangerous weapons by an armed man, to the terror of good citizens, is a misdemeanor at common law. (*State v. Huntley*, 3 Iredell, 418; but see *State v. Simpson*, 5 Yerger 356). On the same general reasoning, it has been held indictable to drive a carriage through a crowded street, in such a way as to endanger the lives of the passers-by ; (footnote omitted) to disturb a congregation when at religious worship; (footnote omitted) to beset a house, with intent to wound, tar and feather; (footnote omitted) to raise a liberty-pole, in the year 1794, as a notorious and riotous expression of ill-will to the government; (footnote omitted) to tear down forcibly and contemptuously an advertisement set up by the commissioners of a sale of land for county taxes; (footnote omitted) to break into a house in the day-time, and disturb its inhabitants; (footnote omitted) and to violently disturb a town-meeting, though the parties engaged were not sufficient in number to amount to a riot.

F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852).

All of Wharton's examples compare the reasoning behind outlawing riding with dangerous weapons to the terror of the public with behavior that caused a disruption to the public peace by engaging in behavior that disrupts others' peace. This supports the proposition that carrying dangerous and unusual weapons to the terror of the people is a manner of carry which disturbs others rather than a particular type of weapon. Notably, Wharton referenced rioting. In order to be charged with rioting, a certain number of people must be involved. Blackstone defined a riot as follows:

> [r]iots, routs, and unlawful assemblies, must have three persons at least to constitute them (footnote omitted) … A riot is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel (footnote omitted): as if they beat a man; or hunt and kill game in another's park, chase, warren, or liberty; or do any other unlawful act with force and violence; or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner.

5 Blackstone 146 (1803). The rule against riots is meant to help preserve the public peace and to avoid unruly mobs. Similarly, to preserve the peace, the common law has outlawed reckless displays of firearms in public.

The other sources *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill v. State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State v. Langford*, 10 N.C. (3 Hawks) 381, 383-384

40

(1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English v. State*, 35 Tex. 473, 476 (1871) (affray "by terrifying the good people of the land"). In fact, one does not even need to be armed with a firearm to commit the crime of affray under the dangerous and unusual doctrine. *See State v. Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed).

And in *Simpson v. State*, the Supreme Court of Errors and Appeals of Tennessee dismissed an indictment alleging that "William Simpson, laborer, with force and arms being arrayed in a warlike manner, in a certain public street or highway situate, unlawfully, and to the great terror and disturbance of divers good citizens, did make an affray . . . ." *Simpson v. State*, 13 Tenn. Reports (5 Yerg.) 356, 361 (1833). The Attorney General sought to rely on Hawkins' claim that "there may be an affray . . .where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people, which is said always to have been an offence at common law, and is strictly prohibited by many statutes." *Id.* at 358.

The court held that the indictment was insufficient as it failed to allege the elements of an affray of fighting between two or more persons. The *Simpson* court repeated Hawkins' comment about the Statute of Northampton that "persons of

41

quality are in no danger of offending against this statute by wearing their common weapons, or having their usual number of attendants with them, for their ornament or defence, in such places and upon occasions in which it is the common fashion to make use of them without causing the least suspicion of an intention to commit any act of violence or disturbance of the peace." *Id*. at 358-59 citing Hawkins, Pleas of the Crown, book 1, ch. 28, sec. 4. 40.

The traditional right to arms "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, at 626. It was a right to keep and carry weapons for usual purposes such as self-defense. This Court should find that batons are not dangerous and unusual weapons and are protected by the Second Amendment. It should do because the prohibitions on carrying dangerous and unusual weapons demonstrates that there was a right to carry for usual purposes. If there were not, then the prohibition on the carry of dangerous and unusual weapons would not have been required. There simply would have been prohibitions on carrying weapons.

### III.    Applying the Appropriate Level of Scrutiny

This Circuit employs a two-step test to determine what level of scrutiny to apply to a Second Amendment challenge. "At the first step, courts ask if the challenged law affects conduct that is protected by the Second Amendment. *Young*, 992 F.3d at 783. If so, courts proceed to step 2 to determine what level of scrutiny to apply. In undertaking this inquiry, courts assess (1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right… A law is unconstitutional under any level of scrutiny if it so severely restricts the core right of self-defense of the home that it amounts to a destruction of the Second Amendment right… Further down the scale, a law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. Otherwise, intermediate scrutiny is appropriate." *Yukutake v. Conners*, 2021 U.S. Dist. LEXIS 153586, *10, __ F.Supp.3d __, 2021 WL 3625307 (quotations and citation omitted).

#### A. California's Ban Is Categorically Invalid

"A law that imposes such a severe restriction on the core right of self-defense that it 'amounts to a destruction of the [Second Amendment] right,' is unconstitutional under any level of scrutiny. *Heller*, 554 U.S. at 629." *Jackson v. City of S.F.*, 746 F.3d 953, 961 (9th Cir. 2014). Here, California's ban on batons is analogous to the handgun ban at issue in *Heller*. The State has interpreted the baton

ban to apply to any bludgeon. "The concomitant circumstances may well proclaim the danger of even the innocent-appearing utensil. The Legislature thus decrees as criminal the possession of ordinarily harmless objects when the circumstances of possession demonstrate an immediate atmosphere of danger. Accordingly, the statute would encompass the possession of a table leg, in one sense an obviously useful item, when it is detached from the table and carried at night in a `tough' neighborhood" *People v. Mercer*, 42 Cal. App. 4th Supp. 1, 5-6 (1995).

A ban on all clubs that can be used as a baton constitutes a class-wide ban on arms for self-defense just like the handgun ban in *Heller*. Several state courts have followed *Heller*'s guidance and struck electric gun bans without the need to apply levels of scrutiny. *See People v. Yanna*, 824 N.W.2d 241, 246 (Mich. Ct. App. 2012); *Ramirez v. Commonwealth*, 479 Mass. 331, 94 N.E.3d 809 (2018) (Apr. 17, 2018); *People v. Webb,* 2019 IL 122951. This Court should follow Circuit precedent, *Heller* and the aforementioned state courts and apply a categorical approach to strike California's ban. If it does not, then it should apply strict scrutiny.

## B. Strict Scrutiny Should Apply

In reviewing a ban on the sale, but not possession, of hollow points in *Jackson v. City & County of San Francisco,* the Ninth Circuit applied intermediate scrutiny because the ban left "open alternative channels for self-defense in the home".

*Jackson*, 746 F.3d at 968. "Jackson may either use fully-jacketed bullets for self-defense or obtain hollow-point bullets outside of San Francisco's jurisdiction." *Id.*

Here, California's baton ban is more analogous to a content-based speech restriction than the one at issue in *Jackson* because it is a ban on possession, even in the home. Thus, it causes a substantial burden to Plaintiffs' Second Amendment rights and strict scrutiny applies, and the State of California must demonstrate a compelling government interest to banning these arms that is narrowly tailored to achieve that interest. *See Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").

California bans batons within the home where protections are "are at their zenith". *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012). California's ban imposes a substantial burden on Plaintiffs' Second Amendment right to use protected arms for self-defense. As such, strict scrutiny applies. The challenged law in this matter bans possession of a protected type of arm (batons). Thus, Circuit precedent supports applying strict scrutiny.

There is no compelling government interest in banning the possession of batons. The State will assuredly assert a generalized public safety interest and that is a sufficiently compelling reason to survive this portion of the strict scrutiny

analysis. However, a generalized interest in public safety is insufficient to be a compelling interest or else *Heller* would have come out the other way. The state does not have an interest in banning batons when a host of other weapons which are much more deadly are legal, including handguns, which the Supreme Court ruled could not be banned in *Heller*. Even if the State does have a compelling interest in banning batons, a complete ban is not narrowly tailored. It is not narrowly tailored because individuals who are law abiding and are qualified to own much deadlier weapons such as firearms cannot own batons despite being no danger to the public. This is evidenced by California law finding them qualified to own a firearm. This Court should apply strict scrutiny and find that California's ban on batons is unconstitutional under that standard. However, as shown below even if this Court applies intermediate scrutiny, California's baton ban is unconstitutional.

## C. Even if Intermediate Scrutiny Applies, California's Ban is Unconstitutional

Even if this Court finds intermediate scrutiny is appropriate to the instant case, California's ban on batons cannot withstand constitutional muster. Our intermediate scrutiny test under the Second Amendment requires that "(1) the government's stated objective . . . be significant, substantial, or important; and (2) there . . . be a 'reasonable fit' between the challenged regulation and the asserted objective." *Silvester v. Harris*, 843 F.3d 816, 821-22 (9th Cir. 2016) (quoting [*United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013)]). Under the second prong

"intermediate scrutiny does not require the least restrictive means of furthering a given end." *Id*. at 827 (quoting *Jackson*, 746 F.3d at 969, concerned only with the purported benefits of a law). Even a dragnet captures *some* people engaged in criminal activity. The question is not whether there are some nonfalse positives, but whether a law's encroachment on constitutional rights is "more extensive than necessary" to serve the government's interest. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 816 (9th Cir. 2013). The relevant inquiry is whether the government can meet its burden of proving that its law does not burden "substantially more" constitutionally protected conduct than "necessary to further [its important] interest." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 214 (1997).

Here, the State cannot have an important government interest in banning policemen batons when handguns are allowed. While public safety is always a government interest, the government cannot invoke public safety without a specific rationale. Here, the State would at least need to show a ban on batons would reduce violent crime and injury. It has not done so, and it cannot do so. But even if the purpose was just to keep them out of the hands of criminals, then California could theoretically ban criminals from having them instead of a flat-out ban on everyone, even the law-abiding. A narrowly tailored solution would serve to not punish the law-abiding citizen while at the same time insuring the often repeated "public safety"

interest is satisfied. And narrow tailoring is required. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017).

In any event, for a law to be substantially related to a government interest, the government must demonstrate that the "restriction will in fact alleviate" its concerns. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). California cannot meet that burden by relying on "mere speculation or conjecture." *Id*. Instead, it must offer evidence demonstrating that the restriction it seeks to impose will in fact further its stated interests. *See City of Los Angeles v. Alameda Books*, *Inc*., 535 U.S. 425, 437 (2002). The State cannot "get away with shoddy data or reasoning." *Id*. at 438. Here, the State fell well short of meeting its burden. *See, e.g.*, *Jackson*, 746 F.3d at 966 (whether the challenged restriction is "substantially related to the important government interest of reducing firearm-related deaths and injuries").

While the State has an important interest in promoting public safety, that does not mean that the State necessarily has an important interest in banning an arm that is typically used for lawful purposes that is less deadly and dangerous than the handguns at issue in *Heller* and *McDonald*. *See McDonald,* 561 U.S. at 783 (rejecting the notion that governments may "enact any gun control law that they deem to be reasonable."). After all, "it would be hard to persuasively say that the government has an interest sufficiently weighty to justify a regulation that infringes constitutionally guaranteed Second Amendment rights if the Federal Government

and the states have not traditionally imposed—and even now do not commonly impose—such a regulation." *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting).

Attempting to nakedly suppress the number of batons owned by law-abiding citizens is "not a permissible strategy"—even if used to further the end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary effects area of free speech doctrine. The Supreme Court has held that government restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49.

As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) makes clear, in defending a restriction as narrowly tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing

speech in the same proportion." *Id.* at 449. "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741 (2011) ("[A] 'beggar thy neighbor' approach to free speech—restricting the speech of some elements of our society in order to enhance the relative voice of others—is wholly foreign to the First Amendment." (brackets and quotation marks omitted)); *cf. Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) ("[T]he government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens . . . .").

Courts have applied similar reasoning in the Second Amendment context. For instance, in *Heller v. District of Columbia,* 801 F.3d 264, 280 (D.C. Cir. 2015) *(Heller III)*, the D.C. Circuit struck down the District of Columbia's prohibition on registering more than one pistol per month. The District defended that ban as designed to "promote public safety by limiting the number of guns in circulation," based on its theory "that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes." *Id.* But the court rejected that simplistic syllogism, explaining that "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home," and so it simply cannot be right. *Id.*; *see also Grace*, 187 F. Supp. 3d at 148 (reasoning that "it is not a permissible

strategy to reduce the alleged negative effects of a constitutionally protected right by simply reducing the number of people exercising the right" (quotation marks omitted)). In other words, the government may not adopt a law with the design and direct effect of limiting the quantity of conduct protected by the Second Amendment.

Here, the State does not present any evidence that its ban on batons promotes public safety especially when handguns are legal and must remain legal pursuant to Heller. Even assuming a ban on carrying them outside the home is justified, it does not follow that it promotes *public* safety to ban them in the home. For the forgoing reasons, the State does not have an important government interest in banning batons.

### D. There is not a Reasonable Fit Between the Ban and Public Safety

Assuming arguendo that batons are used by criminals, that does not mean that there is a reasonable fit between public safety and banning possession of batons for law abiding citizens, even in the home. If that was all that was needed, then *Heller* would have been decided the other way. "Handguns also appear to be a very popular weapon among criminals." *District of Columbia v. Heller*, 554 U.S. 570, 698 (Breyer, J., dissenting). However, the *Heller* majority rejected the dissents' position that because criminals may misuse handguns that this was a sufficient rationale to ban handguns under any level of heightened scrutiny. Addressing the State's suggestions about needing training and that batons should only be for law enforcement (ER054-ER055), the statute is very nearly the definition of a law that

burdens "substantially more" constitutionally protected conduct than "necessary to further [its important] interest." *Turner Broad.*, 520 U.S. at 214. The State could theoretically ban possession of batons by people with a criminal record or by minors. But instead, it bans possession by all citizens including law-abiding citizens such as the Plaintiffs in this case.

The State's rationale is even less strong than the one rejected by the *Heller* majority. In *Heller*, the Court was confronted with a ban on handguns which was "tailored to the urban crime problem in that it is local in scope and thus affects only a geographic area both limited in size and entirely urban; the law concerns handguns, which are specially linked to urban gun deaths and injuries, and which are the overwhelmingly favorite weapon of armed criminals". *District of Columbia v. Heller*, 554 U.S. 570, 681-682, 128 S. Ct. (Breyer, J., dissenting). The Supreme Court rejected both the District of Columbia's arguments and the dissent's arguments and held that "a complete prohibition of [handgun] use is invalid". *Heller*, 554 U.S. at 629.

In *Heller*, it was argued that it was permissible to ban handguns because citizens could own long arms in the District. The State appears to do the same here. The State's expert witness stated that "[r]estricting civilian access to police batons and billies will not materially affect their ability to defend themselves." ER054. The Supreme Court in *Heller* found "[i]t is no answer to say, as petitioners do, that it is

permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Id.*

The State has not shown that its ban is "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995) (citation omitted). And the Courts "demand a 'fit' between the ends and the chosen means." *Minority TV Project, Inc. v. FCC*, 736 F.3d 1192, 1206 (9th Cir. 2013) (citation omitted). The State's ban is not narrowly tailored and there is no "fit" between a blanket ban and its stated compelling interest.

## CONCLUSION

This Court should find that California's ban on the possession of batons is unconstitutional both facially and as-applied to Plaintiffs.

Respectfully submitted,

*s/ Alan Alexander Beck*
ALAN ALEXANDER BECK
2692 Harcourt Drive
San Diego, California 92123
Telephone: (619) 905-9105
Email:
alan.alexander.beck@gmail.com

*s/ Stephen D. Stamboulieh*
STEPHEN D. STAMBOULIEH
Stamboulieh Law, PLLC
P.O. Box 428
Olive Branch, MS 38654
Telephone: (601) 852-3440
Email: stephen@sdslaw.us

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6, counsel for Petitioner states that the following

cases in the Ninth Circuit may raise closely related issues concerning similar

claims:

*Duncan v. Bonta*, No. 19-55376

*Teter, et al. v. Connors, et al*., No. 20-15948

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(f) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 13,892 words and complies with the word limit of Cir. R. 32-1.

2.      This brief complies with the typeface and type size requirements of Fed. R. App. P.32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

Dated: November 23, 2021.

*/s/ Alan Alexander Beck*
Alan Alexander Beck

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2021, I filed the foregoing Appellants' Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Alan Alexander Beck*
Alan Alexander Beck